# IN THE UNITED STATES DISTRICT COURT
## THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

UNITED STATES OF AMERICA      )
           )
     v.                    )       No. 3:16-CR-00020
           )       (Judges Collier/Guyton)
MARK HAZELWOOD, et al.,         )
           )
     Defendants.           )

## DEFENDANT HEATHER JONES' SENTENCING MEMORANDUM

Defendant Heather Jones (Mrs. Jones), by and through undersigned counsel, respectfully submits this Sentencing Memorandum in connection with the sentencing hearing scheduled for 9:00 a.m. on October 3, 2018.[1] This document addresses the United States Sentencing Guidelines (Guidelines) applicable to Mrs. Jones' case. Mrs. Jones is also filing a Motion for Downward Departure or Variance (Sentencing Motion), and has previously filed objections (and a reply brief) to the Presentence Investigation Report (PSR; Docket No. 603). *See* Docket No. 623 (PSR Objections), and 648 (PSR Reply).[2] The arguments in these four submissions complement each other, and collectively represent Mrs. Jones' pre-hearing position on her sentencing.

For the reasons described below, the Guidelines – properly applied – provide for a lower computed range than the one reached by the Probation Office in the PSR. In the alternative, for the reasons described in the Sentencing Motion, a downward departure from that computation, or a sentence that varies from the Guidelines is necessary to achieve a just result. The PSR's

---

[1] Mrs. Jones, having been convicted at trial and not by entry of a plea of guilty, has the right to appeal a judgment of conviction and may choose to do so. References here to allegations in the Indictment and evidence introduced at trial, without qualifying words (e.g., "alleged") are not intended as a concession in derogation of Mrs. Jones' appellate rights or an admission of criminal liability.

[2] At the time of this memorandum's filing, the Probation Office had not yet finalized the PSR. The arguments herein assume that the revised PSR (or its term), filed July 20, 2018 (Docket No. 603) remains in effect.

Guidelines calculation would result in a sentence far "greater than necessary" to achieve the remedial purposes of 18 U.S.C. § 3553(a), and would result in an unwarranted disparity with similarly situated defendants. Whether through correction of the Guidelines range, a downward departure, or a variance, a sentence of probation and community service would satisfy all the objectives of federal sentencing laws, preserve federal funds, and permit Mrs. Jones to continue serving the vital role she has long played in her family and community.[3] In support of her request, Mrs. Jones states as follows:

I.    **Introduction**

Mrs. Jones stands before the Court as a 47-year-old woman, on her only contact with the criminal justice system in an otherwise law-abiding and productive life.  On February 15, 2018, a jury acquitted her of four substantive violations of the wire fraud statute (Counts 3 through 6 of the indictment), but convicted her of conspiracy to commit mail/wire fraud, in violation of 18 U.S.C. § 1349 (Count 1).

Mrs. Jones' conviction stems from her employment as a Regional Account Representative in the Sales Division at Pilot Flying J (Pilot); in particular, she followed the directions of supervisors who intended to defraud certain trucking companies of discounts and rebates. However, the evidence at trial established that Mrs. Jones: never chose which customers to defraud; did not choose the amount by which individuals customers would be defrauded; and did not personally benefit to any significant extent from her supervisors' decisions to defraud Pilot's customers.

---

[3] If the Court believes that a sentence including confinement is necessary, Mrs. Jones urges that portion of her sentence be under home detention. See Sentencing Motion, Part V.D.

2

The PSR calculated Mrs. Jones' total offense level as 25, with a criminal history category of I, implicating a 57-71 month imprisonment range under the Sentencing Guidelines. PSR at 24, 29, ¶¶ 153, 180. Mrs. Jones' Objections and Part III of this memorandum, below, make clear that the Probation Office erred in this calculation in several respects, but most significantly by relying upon a report authored at the United States' request by KraftCPAs, PLLC (Kraft). Because Kraft's analysis falls well short of a "reasonable" estimate of loss in this case, Mrs. Jones submits that the minimal gain she received from the offense conduct should be the basis for any loss enhancement. *See* U.S.S.G. § 2B1.1(b), App. Note 3(c). Correctly applied (and with credit for a minimal mitigating role under *id.*, § 3B1.2 – *see* Part VI, below), Mrs. Jones submits that the Guidelines provide for an Offense Level of 7, which has a range of zero to six months, and for which probation is authorized.

As set forth in her Sentencing Motion, Mrs. Jones further submits, in the alternative, that the full circumstances of her case, including her personal and familial characteristics, the nature and circumstances of her offense of conviction (including the minimal and reluctant role she played in the alleged conspiracy), and her lack of any prior criminal history, warrant a downward departure or variance from the PSR's Guidelines range. Accordingly, Mrs. Jones asks this Court to impose a sentence of probation and community service.

## II.  Applicable Law

### a.  The Guidelines Are Advisory and the Court Must Fashion an Individualized Sentence

As the Court is aware from long experience, 18 U.S.C. § 3553(a) governs its decision to sentence Mrs. Jones. *See, for example, United States v. Kamper*, 860 F.Supp.2d 596, 600 (E.D.Tenn. 2012). Since *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines no longer bind the Court, but are advisory with respect to its decision in fashioning an appropriate sentence. Even as one

3

factor, moreover, the Guidelines are not entitled to deference. As the Supreme Court held in *Nelson v. United States,* 555 U.S. 350, 352 (2009): "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." (emphasis in original). As the Seventh Circuit has explained, "[t]he sentencing judge may not perfunctorily impose a guidelines sentence or even presume that such a sentence is appropriate in a given case." *United States v. Warner*, 792 F.3d 847, 855 (7th Cir. 2015).[4] Although the Court of Appeals must presume a within-Guidelines sentence to be substantively reasonable, this presumption has no effect here. Indeed, the validity of the appellate presumption in such cases rests on the District Court's *independent* assessment of the defendant's circumstances and offense. *See United States v. Adams,* 873 F.3d 512, 520 (6th Cir. 2018).

Therefore, while the Court is required to consider the Guidelines ranges, it must tailor the sentence in light of other statutory concerns as well.  *Booker,* 543 U.S. at 245 (citing 18 U.S.C. § 3553(a)). In *Gall v. United States*, the Supreme Court stated that:

> [T]he Guidelines should be the starting point and the initial benchmark.  The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable … He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

---

[4] The abuse-of-discretion standard of appellate review depends on the District Judge exercising his own judgment, independent of the Guidelines, concerning the appropriate sentence. *United States v. Bond,* 511 F.3d 568, 578-79 (6th Cir. 2007).

552 U.S. 38, 49-50 (2007). In sentencing Mrs. Jones, the Court must "consider [her] as an individual," and fashion a sentence that "fits the offender and not the crime." *Pepper v. United States*, 562 U.S. 476, 487 (2011).

In addition, the Supreme Court has emphasized that "extraordinary circumstances" are not required to justify a sentence outside the Guidelines range, and that the sentencing court "is in a superior position to find facts and judge their import under § 3553(a) in the individual case … 'The sentencing judge has access to, and greater familiarity with the individual case and the individual defendant before him than the [Sentencing] Commission or the appeals court.'" *Gall*, 552 U.S. at 47, 51-52 (quoting *Rita v. United States*, 551 U.S. 338, 357-58 (2007)). Accordingly, the Guidelines are but one factor for the Court to consider when exercising its discretion in determining the appropriate sentence.

### b. The Court Must Assess Mrs. Jones' Agreement with Particularity

In the sentencing of fraud conspirators, the Guidelines' provisions for relevant conduct (U.S.S.G. § 1B1.3) and loss amount (*id.* § 2B1.1) intersect. The Sixth Circuit requires Courts to make particularized findings as to the factors identified in U.S.S.G. § 1B1.3:

> The district court must make two distinct findings when calculating the loss amount. *United States v. Campbell,* 279 F.3d 392, 399–400 (6th Cir. 2002).
>
> First, the district court must make particularized findings about "the scope of the defendant's agreement." *Id.* at 400; U.S.S.G. § 1B1.3(a)(1)(B) & cmt. n. 2. This finding "differentiate[s] between co-conspirators' varying degrees of culpability." *Campbell,* 279 F.3d at 400. The district court may consider "any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others," U.S.S.G. § 1B1.3 cmt. n. 2, but mere "aware [ness] of the scope of the overall operation" is insufficient, *Campbell,* 279 F.3d at 400.
>
> Next, the district court must make particularized findings about "the foreseeability of [the defendant's] co-conspirators' conduct." *Id.;* U.S.S.G. § 1B1.3(a)(1)(B). Only conduct reasonably foreseeable to the particular defendant may be attributed to him. *United States v. Orlando,* 281 F.3d 586, 600 (6th Cir.2002).

5

But even if the defendant could reasonably foresee conduct in furtherance of the conspiracy, the loss from that conduct will only be attributed to the defendant if the conduct falls within the scope of his particular agreement. *See Campbell,* 279 F.3d at 400.

*United States v. Harris*, 636 F. App'x 922, 926 (6th Cir. 2016) (paragraph breaks added for clarity). The Court must explain its factual determinations by referring to particular evidence, and must present more than general conclusions. *United States v. Orlando*, 281 F.3d 586, 601 (6th Cir. 2002).

### III. The PSR's "Loss Amount" Is Too Unreliable for Use Under the Guidelines

The Government's proffered loss amount is based entirely on the work of KraftCPAs, LLC (Kraft). The "Kraft Report" has the appearance – but not the substance – of an objective and verified calculation using all available evidence. Beneath its veneer of professionalism, the Kraft report's analysis of, and conclusions regarding Mrs. Jones are so riddled with assumptions, disregarded documentation, and Government directives that they cannot serve as either the "reasonable estimate" required by the Guidelines, or the particularized analysis required by the Sixth Circuit.

#### a. Kraft Has Inconsistently Applied Questionable Methods

Kraft's methodology can be found in three documents: a March 30, 2015 letter from Vic Alexander to Pilot's counsel at Neal & Harwell (Exh. A); a June 21, 2018 letter from Neal & Harwell to AUSA Hamilton (Exh. B); and a July 18, 2018 letter from Mr. Alexander to Neal & Harwell (Exh. C). Read carefully, the letters reveal that Kraft employed a flawed process to "attribute" losses to Mrs. Jones which cannot meet the requirement that her culpability be particularly assessed.

6

*March 30, 2015* – Kraft's first attempt to assign losses to Pilot employees was based on and "intended to supplement" Pilot's Internal Audit (IA) review during 2013-2014. Exh. A (at its Exh. 1 at 1). Kraft disavowed, however, that it was able to assess Pilot employees' intent:

> Where used throughout this project, the terms "intent" and "intentional" do not mean that Kraft has purported to substitute its judgment for the Government or the trier of fact in determining the mens rea of the individual salespeople analyzed. Instead, these terms are shorthand terminology for the process Kraft undertook in Phase II, Attributing Specific Losses to Salespeople. Specifically, Kraft independently searched for documentation that indicated levels of participation in adjusting rebates or off-invoice discounts so as to attribute those losses to a particular salesperson.

*Id.* As will be shown, however, this disclaimer did not go far enough.

With respect to "ISR's" like Mrs. Jones,[5] Kraft utilized an attribution level of "2" (where it said that it could find no "clear documentation that the ISR had knowledge that the adjustment was intended to defraud the customer") or "2a" (where "there was documentation that clearly indicated the ISR had direct knowledge of customer deception"). *See id.* at 5. *Id.* The details of Kraft's procedures, however, reveal these descriptions to be erroneous and oversimplified.

Kraft claims to have searched multiple sources for documents relevant to establishing an employee's knowledge. *Id.* at 6. (Kraft implies that it took all the documents it found into account, but it clearly did not in many cases, as shown below.)

In addition to disregarding relevant documents, Kraft attributed losses based on other, non-documentary considerations, too, for sometimes illogical reasons. These included:

- "[D]ocumented patterns of behavior," such as implementing discount caps or setting up a deal in the system but sending the customer a more favorable daily pricing file.

---

[5] Mrs. Jones' title was "Regional Account Representative," yet Kraft refers to her and her coworkers as "ISRs". Exh. 1 at 2. Complaining of this would be nit-picking, but Kraft's 2015 report likewise employs "salesperson" in a manner that makes it impossible to discern whether any such reference is to Outside Sales Representatives (OSRs, *id.* at 1), ISRs, or both. *See, for example, id.* at 6.

- An ISR mailing an OSR a monthly rebate report, where a lesser rebate was ultimately paid (regardless of any response by the OSR);

- Subsequent admissions of changing the discount without customer communication, or where the customer "detected manipulation"; and

- "Backing into" a revised manual rebate received the higher attribution level (1 for OSRs, 2a for ISRs) – but not when the ISR followed the OSRs instruction to reduce a rebate by a fixed amount.

*Id.* at 6-7. For the first three, Kraft doesn't explain whether it attributed losses at the 2 or 2a levels (a distinction that became critical in its 2018 work). Nor does Kraft explain why it would attribute more culpability in the case of a rebate amount that was "backed into" versus one in which the ISR adjusted the rebate by or to the exact amount instructed by the OSR. It described this decision as a "judgment call." In addition, although Kraft claimed that losses were "unattributed" for a number of reasons – including vague deals and customer noncompliance – it failed to adhere to these standards for numerous customers.

Once Kraft attributed a loss to an ISR, she received that attribution as long as she was assigned the customer. *Id.*, its Exh. 1 at 5, 7. Kraft did not take into account the effect of the passage of time on the certainty of a customer's deal, despite ample evidence in both the source documents and post-search audit workpapers that in many cases, the continued viability of the deal was highly questionable. Kraft also assumed, in the absence of any evidence, that Mrs. Jones simultaneously possessed multiple sources of information, though it took Pilot's Internal Auditors and Kraft months or years to compile the same set of documents.

*June 21, 2018* – Neal & Harwell's letter to AUSA Hamilton described several revisions to Kraft's procedures, which purport to raise the evidentiary bar for attribution – i.e., to provide "an enhanced level of required documentation to attribute those customers' losses to the defendants."

8

Exh. B, Att. A at 1. The letter claims that Kraft's requirements included knowledge of the discount communicated to the customer and knowledge of intent to defraud the customer. *Id.*

But Neal & Harwell's June 2018 letter also describes a key exception relevant to Mrs. Jones' case: Kraft did not undertake further review of "loss amounts to which Darren Seay testified at trial," including JTL Carriers, Amerifreight, and Halvor. Exh. 2 at 3.[6] Despite the Government's faith in Mr. Seay, his word is not Gospel. At times, as will be shown at the hearing, his own coworkers noted their disagreement with his conclusions.

*July 18, 2018* – In a case this complex, the devil lies in the details, as Kraft's July 2018 report reveals. But with respect to Mrs. Jones, at least, Kraft's final letter resembles a movie set: it provides the semblance of a detailed, objective analysis of her knowledge and intent with respect to each customer, but none of the substance.

Kraft first restates Neal & Harwell's description of the "enhanced" evidentiary standard, Exh. B at 1-3, but then concedes: "*[a]t the Government's request*, there were certain exceptions to this attribution methodology." *Id.* at 3 (emphasis added). Among these eight exceptions are two that are relevant – indeed critical – to Kraft's errors in computing Mrs. Jones' loss amount. The first is the aforementioned exclusion of the customers about which Darren Seay testified at trial. *Id.* at 3 (numeral 1). Here is the second:

> 7.      Brian Mosher and Lexie Holden testified at trial that they defrauded *certain customers*. Kraft attributed those customer losses to Brian Mosher, Heather Jones, Lexie Holden, and Supervisors …, *regardless of whether both Attribution Requirements were met.*

---

[6] Given that Kraft's 2018 reports greatly deviated from the computations of Pilot's Internal Auditors, on which Mr. Seay based his testimony, the Government's decision not to have Kraft review these companies' records calls into question Mr. Seay's qualifications and opinions.

*Id.* at 4 (emphasis added). The net effect of this exception is that, as to Mrs. Jones, Kraft did not employ an "enhanced level of required documentation," relying instead on methods which the Government implicitly has acknowledged were faulty (by requiring further review of others, that led to significant modifications). As will be shown, this exception – and Kraft's numerous deviations from its own methods – belies Kraft's credibility as an objective, particularized analysis of Mrs. Jones' knowledge and intent.[7]

### b. Mrs. Jones Adopts Mr. Hazelwood's and Mr. Wombold's Criticisms of the Kraft Report

As described above, Kraft employed different methods and standards in attributing losses to each of the three trial-convicted defendants. The defendants have certain objections in common, however, and Mrs. Jones, therefore, adopts Parts II through VI of Mr. Hazelwood's Motion for Downward Departure. *See* Docket No. 673 at 2-18.[8] (Although Mr. Hazelwood entered into a stipulation with the Government concerning his loss amount, *see* Docket No. 678-1, the arguments of his counsel and expert – which undoubtedly led to that stipulation – are sound.)

In addition, Mrs. Jones adopts Mr. Wombold's criticisms of Kraft's work. *See* Docket Nos. 685, 688.

---

[7] The wide variation in Kraft's estimates for Mrs. Jones also calls into question the reliability of its work:

- March 2015 - $12,274,892
- June 2018 – $10,080,823
- July 2018 – $8,697,248
- August 2018 – $ 5,448,497

[8] Mrs. Jones disagrees, however, that expending additional time and resources could result in a "reasonable estimate" of loss in her case. *See* Docket No. 673 at 7. Instead, as argued below in Part V, she believes that in her case, the better course would be to estimate her gain, which was minimal. *See* U.S.S.G. § 2B1.1 App. Note 3(B).

10

### c. The Government's Proof of Loss Suffers from Critical Defects

The United States has the burden of proving a "reasonable estimate" of the loss used in computing a sentence under the Guidelines. *United States v. Jones,* 641 F.3d 706, 712 (6th Cir. 2011). The use of unreliable information in sentencing also violates a defendant's rights to due process. *United States v. Adams*, 873 F.3d 512, 519 (6th Cir. 2018). Kraft's evidence at sentencing will be found to suffer from several significant errors, and fails to meet this standard.

### i. Kraft Presumed Victimhood

The threshold question in any fraud case is whether the putative victim was, in fact, deprived of a tangible property interest by deceit. *United States v. Frost*, 125 F.3d 346, 361 (6th Cir. 1997). In a run-of-the-mill fraud case, whether a person or company was a victim follows directly from the defendant's conviction. This case is far from run-of-the-mill, however, with respect to this basic issue. Pilot is a legitimate enterprise, not a Ponzi scheme or boiler room operation. It has thousands of customers whose contractual rights varied widely. For many of those customers, Pilot assumed the agreements they had entered with Flying J, when Pilot acquired that company. For other customers, the documentary record is simply insufficient to establish if they had a "deal" at all, or what its terms were. Still other customers, as trial testimony established, had agreements whose terms—and the parties' compliance with them—changed frequently over the course of several years. *See, for example,* Docket No. 351 at 150-51 (testimony of Katy Bibee: "I mean, you might change someone's discount a couple of times a week"; *id* at 150:20-21).

Pilot's Internal Audit effort in 2013-2014 understandably sought to mitigate enormous damage to the company's customer relations, foreclose civil litigation (including punitive damages), and position it for negotiations with the Government. For a company with revenue measured in the tens of billions of dollars, this made sound business sense, and even Kraft

11

acknowledges the existence of, and the need to address, customer bias in this computation. *See* Exh. C at Att. 1 at 2 (Kraft's July 18, 2018 Report, describing the "benefit-to-the-customer" methodology).

To punish Mrs. Jones for failing to provide discounts and/or rebates to which a customer had no legal entitlement would be substantively unreasonable and – as to those customers – a violation of the well-established rule in the Sixth Circuit that loss amounts must be based in "economic reality," and that factually impossible losses, however intentional, cannot be counted. *See, for example*, *United States v. Thornton*, 718 Fed. App'x 399, 407 (6th Cir. Jan. 3, 2018). It makes little sense to increase Mrs. Jones' sentence for conduct which, if it had been contemporaneously discovered, would not have resulted in the customer's right to repayment.

Despite Kraft's claims that it reexamined any "unattributed" losses where evidence of an agreement or a customer's compliance with its terms was doubtful, Kraft demonstrably fell short of this assertion.

### ii. Kraft's Analysis Suffers from Several Types of Errors

Mrs. Jones anticipates that upon cross-examination, the Government's proof at sentencing of Kraft's review will reveal at least the following critical and substantial categories of error:[9]

1. Inadequate evidence of the existence of a deal or its terms

   In a large number of cases, confusion of a deal's terms is evident at the time of a rebate payment, making it impossible to ascribe knowledge (or intent) to Mrs. Jones. In other cases, neither Pilot's Internal Auditors nor Kraft could find substantial evidence of the deal.

   In the case of Nationwide Transportation, for example, Kraft's own analysis acknowledged that "it was unclear if Jones or Mosher knew the discount represented to

---

[9] The companies listed below are examples only, representative of the categories of Kraft's errors.

the customer."[10] Despite the lack of any contemporaneous evidence of either the deal or Mrs. Jones' knowledge of it, Kraft attributed losses for fraud to her.

2. Customer failure to comply with deal obligations

Kraft clearly failed to take gallon requirements (including minimums, ramp-up periods, and thresholds) into account, despite Kraft's claims to have done so.

Other requirements were sometimes imposed on customers, too, such as exclusively purchasing fuel from Pilot. Kraft frequently failed to ascertain whether these were, in fact, met.

   a. Minimum gallon purchases

   Kraft attributed "losses" for periods in which numerous customers failed to satisfy minimum gallon requirements. As Mr. Hazelwood's sentencing memorandum demonstrates, Kohler met its gallon requirement *in less than 25% of the months* for which Kraft attributed losses. *See* Docket Nos. 673 at 9-10, 673-1 at 42-43.

   Kraft also disregarded gallon requirements from Flying J contracts that were assumed by Pilot when the companies merged. Diesel Fuel Purchase Agreement spreadsheets from 2010 list "120,000" under the "MONTHLY VOLUME REQUIREMENTS" column for Nationwide. Even though the company only met this requirement in a handful of months (falling far short in many more), Pilot's Internal Auditors and Kraft ignored this information.[11]

   b. Exclusivity agreements

   In the case of Dillon Transport, Kraft ignored clear documentary evidence that in 2011, the customer agreed to purchase fuel exclusively from Pilot, but had breached this requirement, at least until October 2012.[12] Despite this failure, Kraft attributed losses to Mrs. Jones throughout this period.

3. Dubious pricing information

As Mr. Hazelwood has observed, Kraft used OPIS prices even in cases in which customers' cost-plus deals were negotiated using prices provided by Axxis (an alternative source of pricing information), resulting in larger "loss" amounts. *See* Mark Hazelwood's

---

[10] *See* Exh. D (taken from Gov't Exh. 5057 at Sentencing_001722) (emphasis added).

[11] *See* Exh. E (partial spreadsheet produced in discovery as QKX17_0056787928.

[12] *See* Exh. F (September 16, 2011, Weekly Call Sheet of Jonathan Duvall with an entry for Dillon Transport, produced in discovery as QKX17_0045321224: "Met with Charles and Jeffrey. They are moving over to TCH and have agreed to lock down the cards to PFJ only. That will pick up another 100k gallons.").

13

Motion to Reconsider Order Denying Issuance of Subpoena Duces Tecum Pursuant to Rule 17(c), Docket No. 660 at 6.[13]

4. Reliance on manual rebate approval spreadsheets exchanged between Mrs. Jones and Brian Mosher.

Last, but certainly not least, at the Government's express direction, Kraft gave disproportionate weight to the presence of a company on a single manual rebate approval spreadsheet exchanged between Mrs. Jones and Mr. Mosher. This error is so significant that it merits fuller explanation:

### iii. Kraft Inflates the Significance of Brian Mosher's Spreadsheet Testimony

As previously described, with respect to Mrs. Jones, Kraft's final methodology required it to attribute to her the loss for a customer based solely on Brian Mosher's testimony "at trial that [he] defrauded certain customers." *See* Exh. C at Att. A at 4, numeral 7; *see also* Part III.a, above. Contrary to the phrase "certain customers," however, Kraft attributed losses to Mrs. Jones primarily – and, in some cases, solely – on the basis that the customer was found on a single manual rebate approval spreadsheet (Joint Defense Exh. 1802) about which Mr. Mosher testified.

Mr. Mosher's testimony was far from specific, however. For example, Kraft attributed $37,415 of loss to Iowa Motor Truck (IMT). Kraft's sentencing summary for IMT reads, in its entirety:

**Iowa Motor Truck**

Iowa Motor Truck (IMT) was primarily a restricted, manual rebate customer.

---

[13] The use by both Pilot's Internal Auditors and Kraft of OPIS as the basis of computing losses presumes that the customer's deal was based upon OPIS. This evidence was contrary to the evidence in some cases; in others, it was unsupported by any evidence. Customers may have believed that their cost-plus deals were based, instead, on Pilot's own actual costs, which the testimony at trial established were typically – but not consistently – lower than OPIS's. Mrs. Jones is not suggesting that Kraft should have used Pilot's actual costs where a customer's deal did not expressly refer to OPIS. Instead, Kraft's across-the-board choice of OPIS reflects its arbitrary disregard of the actual deals Pilot's outside sales staff had reached with its customers.

> IMT was listed on the November 2009 Mosher/Jones rebate spreadsheet (PFJ004071465, PFJ004071466).
>
> This spreadsheet was sent by Mosher with modified rebate amounts. Jones then adjusted the customers' discounts, resulting in a rebate that approximated the modified amount.
>
> Mosher also testified that he had defrauded *certain customers* (testimony and exhibit) and referenced the July 2010 Mosher/Jones rebate spreadsheet. IMT was a customer on the spreadsheet.
>
> Based on the above items, losses were attributed.

Exh. G (comprising Govt. Sent. Exh. 5044 at Sentencing_001378)(emphasis added). The excerpts of Mr. Mosher's testimony which accompany this analysis, however, do not include a single reference to IMT. *Id.* at Sentencing_001383 to -001395. Instead, Mr. Mosher described the spreadsheet in general terms, and testified concerning his own intent to defraud some customers. *Id.* at Sentencing_001387:1-6. But in that same portion of cross-examination, Mr. Mosher conceded that there were *legitimate* reasons for the spreadsheet. *Id.* at Sentening_001386:1-25.

Mr. Mosher did not testify, however, that Mrs. Jones knew, or even had reason to know, solely from his modification of a customer's rebate, that he did so intending to defraud the customer. Instead, in other portions of his cross-examination, Mr. Mosher acknowledged that it would have been legitimate to cut a customer's rebate for failing to meet a gallon requirement, *see* Docket No. 374 at 135:21-25 (testimony of Brian Mosher), and that he had greater information than did Mrs. Jones relevant to knowing if a discount reduction was legitimate. *Id.* at 98:25-100:20.[14] Furthermore, as discussed above, Pilot employees testified about the fluidity of deals –

---

[14] It is unclear from the Government's submissions concerning Kraft whether that company received the entire trial transcript or just select portions.

Case 3:16-cr-00020-CLC-HBG   Document 695   Filed 09/19/18   Page 15 of 21   PageID #: 19415

*see* Docket No. 351 at 150-51 (testimony of Katy Bibee) – but Kraft disregarded this evidence and assumed that Mrs. Jones necessarily knew that Mr. Mosher's deals were unchanging.[15]

Mr. Mosher testified there were legitimate reasons to use the spreadsheet, that some changes were legitimate, and that he was better positioned to know the information relevant to ascertain the legitimacy of any change. If these assertions are true, attributing loss to Mrs. Jones solely or primary because a company appeared on a spreadsheet is procedurally unreasonable, and violates the Sixth Circuit's definition of relevant conduct under the Guidelines. *See Adams*, 873 F.3d at 519; *Harris*, 636 F. App'x at 926.

## IV.    The Government's Proposal to Average Losses Is Likewise Faulty

In its sentencing memorandum concerning Mr. Hazelwood, the Government proposes, as an alternative to the Kraft report's attribution approach, that loss be estimated by multiplying the average loss per customer by the number of customers that Kraft assigned to Mr. Hazelwood. *See* Docket No. 669 at 18-20. Although the Guidelines endorse the use of an average multiplied by the number of victims, U.S.S.G. § 2B1.1, App. Note 3(C)(iv), in the circumstances of this case, such an estimate would not be a reasonable one.

---

[15] Mr. Mosher admitted on cross-examination that he didn't tell Mrs. Jones everything that he was doing or knew about a customer's deal, and he even admitting to having to ask one customer's employee – Cameron Fraley at Halvor Lines – what the deal was, because Mr. Mosher had forgotten it, and he had kept it secret from Mrs. Jones. Mr. Mosher testified, at the end of cross-examination concerning Govt. Trial Exh. 1703:

> Q     Were you basically just, like, so deep into this you
> couldn't remember what lies you had told to which people?
>
> A That -- that could be true, yes, sir.

*See* Docket No. 374 at 84:21-88:25 (testimony of Brian Mosher).

16

Neither of the two factors in the Guidelines' suggested equation (i.e., *average* x *victims = loss*) are reasonably estimable. The Government suggests that the Court could rely on Darren Seay's trial testimony concerning six trucking companies, and asserts without explanation that this "is a reasonably reliable average of actual loss per customer". Docket No 669 at 19. But the Government chose to present these six companies' evidence at trial, out of the hundreds of companies the Government claims were defrauded. It seems likely, therefore, that these companies lay at one end of the spectrum of companies, and are atypical. Furthermore, the Government's decision not to subject Mr. Seay's analysis to Kraft's further review casts doubt on his computations. The number of victims is likewise imprecise. As described above, for Mrs. Jones, Kraft made both systematic and company-specific errors in concluding that a trucking company met the definition of victim for whom loss should be attributed.

Despite the surface appeal of using the average approach, upon further analysis it evidently suffers from the same shortcomings of Kraft's attribution analysis.

**V.     Gain Method**

The Guidelines endorse the use of a defendant's gain "if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1, App. Note 3(B). *See, for example, United States v. Parris,* 573 F.Supp.2d 744, 748 (E.D.N.Y. 2008).

Mrs. Jones received most of her income from Pilot in the form of a salary, but a small portion was a commission based on sales. Reductions in discounts and rebates had a very small effect – if not a *de minimis* one – on Mrs. Jones' commission payments. *See* Docket No. 471 at 134:15-25 (testimony of Mr. Jennings).

During the time period advanced by the Government – February 2008 through January 2013, Mrs. Jones received $224,791 in total commissions (most of which was unaffected by the

17

discount and rebate reductions). Even applying a conservative estimate (i.e., the Kraft report) of the effect of the scheme and using Mrs. Jones' *maximum* commission rate, Mrs. Jones' expert – in rebuttal to the Government's proof at the hearing – will establish that she received only a little over $10,000 in illicit gain.

Under the Guidelines, this equates to a 2-level enhancement. U.S.S.G. § 2B1.1(b)(1)(B) (for "loss" greater than $6500 and less than $15,000). When substituted for the PSR's 18-level increase, Mrs. Jones' Total Offense Level becomes 9. (*See* Part VI, below, which argues that this should be reduced by an additional 2 levels, to 7. Mrs. Jones also argues separately, in her Sentencing Motion, that the enormous disparity between the PSR's loss amount and her gain justifies either a downward departure or variance.)

Although Mrs. Jones believes that this calculation more justly reflects her participation, it is also the only reasonable estimate that can be used in this case for purposes of § 2B1.1(b)'s specific offense characteristic.

## VI.   Mrs. Jones Played a "Minimal Role" in the Pilot Scheme

As Mrs. Jones described in her objections to the PSR, the Probation Office erred in giving her a "minor" rather than "minimal" mitigating role reduction of four points. *See* Docket No. 623 at 18; PSR at 24 ¶ 148. The Government opposed Mrs. Jones' objection, *see* Docket No. 644 at 8-12, arguing that Mrs. Jones' role was "indispensable" to Mr. Mosher's scheme to defraud his customers. As Mrs. Jones Reply makes clear, however, the Guidelines expressly rules out a defendant's "indispensability" as a factor in assessing his or her mitigating role:

> The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity.

18

U.S.S.G. § 3B1.2, Application Note 3(c). For the reasons addressed in her PSR Reply, Mrs. Jones submits that the Court should assign her a minimal role in the offense, reducing her score by 4 points, rather than 2.

## VII.    Conclusion

For the foregoing reasons, Mrs. Jones urges the Court to conclude that when the Guidelines are properly applied, she should receive a 2-level specific offense characteristic increase for her gain from the offense, and a 4-level *decrease* for her minimal role in the scheme. *See* U.S.S.G. §§ 2B1.1(b)(B), 3B1.2. When these numbers are substituted for those of the PSR (at 24, ¶¶ 145, 148), her total offense level is 7, instead of 25, resulting in a Guidelines sentence in Zone A of zero to six months.

Should the Court disagree, for the reasons described in the Sentencing Motion Mrs. Jones further urges the Court to depart or vary downward from any greater Guidelines finding, and sentence her to probation.

Respectfully submitted,


*/s/ Benjamin J. Vernia (with permission)*

BENJAMIN J. VERNIA
ANDREW K. MURRAY
**Counsel for Heather Jones**
*The Vernia Law Firm*
1455 Pennsylvania Avenue NW, Ste. 400
Washington, DC 20004
bvernia@vernialaw.com
amurray@vernialaw.com

19

CULLEN WOJCIK
*The Law Office of Cullen M. Wojcik*
422 S. Gay Street, Suite 302
Knoxville, TN 37902
wojciklaw@gmail.com

## CERTIFICATE OF SERVICE

I certify that this document was filed electronically on September 19, 2018. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

By: __/s/  Cullen M. Wojcik_____
CULLEN M. WOJCIK